CASEY R. FRONK (Illinois Bar No. 6296535)
FronkC@sec.gov
TRACY S. COMBS (Cal. Bar No. 298664)
CombsT@sec.gov
*Appearing pursuant to LR 83.2(b)*
Counsel for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, UT 84101-1950
Tel.: (801) 524-5796
Fax: (801) 524-3558

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION - PIKEVILLE**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>  Plaintiff,<br><br>  vs.<br><br>JUSTIN WALLACE HERMAN, an individual; ANTHONY MICHAEL BAKER, an individual; IAN HORN, an individual, and ISLAND CAPITAL INC, a corporation;<br><br>  Defendant. | Case No.:<br><br>Judge: |

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges as follows:

**SUMMARY OF THE ACTION**

1. From at least April 2017 through at least June 2017, Justin Wallace Herman, Anthony Michael Baker, Ian Horn, and Island Capital Inc ("Island Capital") (together herein, "Defendants") were involved in a scheme to enable Herman and Island Capital to obtain unrestricted shares of a shell company, NxGen Brands, Inc. f/k/a Pyramidion Technology Group,

1

Inc. ("PYTG"), inflate the share price of PYTG, and dump thousands of shares of PYTG into the market.

2. The scheme involved four layers of deception.

3. First, Baker took steps to conceal PYTG's status as a shell company to create the appearance that PYTG had actual business.

4. Second, Horn provided PYTG's transfer agent with a Rule 144 opinion letter that falsely stated that PYTG was not a shell company, thus enabling Herman and Island Capital to rely on the safe harbor of Rule 144 of the Securities Act of 1933 ("Securities Act") to obtain unrestricted shares of PYTG.

5. Third, Herman and Island Capital engaged in manipulative trading to increase PYTG's share price.

6. Fourth, Herman employed investor-solicitation call centers and a complicit market maker to sell off his and Island Capital's shares of PYTG to investor victims through coordinated trades.

7. As a result of this conduct, Herman and Island Capital profited at least $810,830.78 and $353,855.37, respectively and Baker spent approximately $106,040.21 of Island Capital's proceeds on personal expenses.

8. By engaging in this conduct, as further described herein, Defendants violated and, unless restrained and enjoined by this Court, may continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] (as to Herman, Baker, and Island Capital); Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)] (as to Horn); Section 9(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78i(a)(2)] (as to Herman and Island Capital); Sections 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] (as

to Herman, Baker, and Island Capital); and Exchange Act Rule 10b–5(a) and (c) [17 C.F.R. § 240.10b–5(a) and (c)] (as to Herman, Baker, and Island Capital).

## JURISDICTION AND VENUE

9. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. § 77t(b) and (g)] and Sections 21(d) and (e) of the Exchange Act [15 U.S.C. § 78u(d) and (e)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as this Court may deem just and appropriate.

10. Defendants were involved in the offer and sale of the common stock of PYTG, which is a "security" as that term is defined under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

11. Defendants, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce in connection with the conduct alleged in this Complaint.

12. This Court has subject matter jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], and 28 U.S.C. § 1331.

13. Venue in this District is proper because Defendants are found, inhabit, and/or transacted business in the Eastern District of Kentucky and because one or more acts or transactions constituting the violations occurred in the Eastern District of Kentucky.

## DEFENDANT

14. **Justin Wallace Herman**, age 51, is a resident of Canonsburg, Pennsylvania. At the time of the alleged conduct, Herman was vice president of Island Capital. During its

investigation, the Commission sought testimony from Herman, but instead of sitting for testimony, Herman provided a declaration in which he asserted his Fifth Amendment right against self-incrimination.

15.     **Anthony Michael Baker**, **age** 54, is upon information and belief a resident of Jenkins, Kentucky. Baker is the president and CEO of Island Capital.

16.     **Ian A. Horn**, age 67, is a resident of Plant City, Florida. Horn is an attorney licensed to practice in Florida. Horn provided opinion letters for issuance of shares of PYTG to Island Capital and to Herman.

17.     **Island Capital Inc.** is a Tennessee entity incorporated on September 15, 2014 with its principal place of business in Pikeville, Kentucky. Baker is the president of Island Capital and, during the relevant period, Herman was its vice president. Baker and Herman had trading authority over Island Capital's brokerage accounts, which were used to deposit and sell shares of PYTG.

## FACTS

**Defendants' Acquisition and Deposit of PYTG Shares**

18.     Beginning in at least 2013, PYTG—a Nevada corporation with its principal place of business in Davie, Florida, whose common stock is quoted on OTC Link, LLC, which is owned by OTC markets Group Inc. and is a national Alternative Trading System and an electronic inter-dealer quotation system that displays quotes from broker-dealers for many over-the-counter ("OTC") securities—was engaged in the business of selling an alternative energy storage system under the management of then CEO (referred to herein by his initials, "D.F.").

19.     On June 2, 2015, PYTG issued D.F. a promissory note for $21,000 in exchange for D.F.'s loans to the company.

20. A year later, D.F. notified PYTG's transfer agent that the company had no capital or assets and had found no sales opportunities; therefore, he was dissolving the company, discontinuing OTC Market listing services, and cancelling the transfer agent's services.

21. The transfer agent offered to locate a buyer for PYTG, and D.F. accepted the offer.

22. In or around November 2016, the transfer agent located a buyer, who purchased D.F.'s controlling block of PYTG's shares and became the new CEO.

23. In or around February 2017, D.F assigned his promissory note to an apparent third-party buyer for $5,000.

24. On April 10, 2017, that buyer assigned a portion of the PYTG note to Island Capital for $5,000, which in turn assigned a portion of the note to Herman on April 13, 2017 for $5,000.

25. On April 25, 2017, Island Capital converted $374 of the note into 374,000 shares of PYTG common stock, and Herman converted $374 into 371,000 shares of PYTG common stock (collectively, the "Converted Shares").

26. At the time PYTG changed control, it had been delinquent in its disclosures with OTC Markets. In or around March 2017, however, PYTG published a series of quarterly and annual reports to bring its financial disclosures up to date.

27. In its annual disclosure for the fiscal year ended December 31, 2016, PYTG reported no assets, no revenue, and described that it was "evaluating multiple technologies for commercialization and market introduction" but "[did] not have any current contracts or technology licenses."

28. To falsely create the appearance that PYTG—contrary to its prior annual disclosure—had assets and business opportunities, Baker facilitated PYTG's sham acquisition of two entities: Studebaker Vending Company and Studebaker Distribution, Inc. (collectively, the "Studebaker Entities").

29. Baker retained a business associate, P.T., to create the Studebaker Entities.

30. As P.T. acknowledged in an April 6, 2018 email discussing the Studebaker Entities (in which he admitted that "Baker had me set up the Corps. . . . the Corps are just private shells, nothing in them"), the Studebaker entities were not actual business entities but shell corporations with no assets.

31. On April 25, 2017, PYTG published supplemental information on OTC Markets announcing an asset purchase agreement, pursuant to which it had purchased 55% of the Studebaker Entities for 50,000 shares and $2.2 million.

32. The asset purchase agreement stated that PYTG was purchasing its interest in the Studebaker entities from J.T. of Ascamp, Kentucky, who is Baker's nephew. Nonetheless, and as J.T. himself acknowledged in a subsequent interview during the Commission's investigation, J.T. had, at that time, never even heard of the Studebaker Entities or PYTG, never knowingly entered into any agreement with PYTG, and was never compensated in any way by PYTG for any "purchase" of an interest in the Studebaker Entities.

33. On May 10, 2017, Horn signed Rule 144 opinion letters for Island Capital and Herman.

34. A Rule 144 opinion letter is a letter that an attorney provides to an issuer's transfer agent to opine that a company and its shareholder satisfies the conditions of Rule 144 of the Securities Act. Rule 144 is a safe harbor provision, which, if met, enables a shareholder to

rely on the exemption from registration found in Section 4(a)(1) of the Securities Act. If an offering of a security qualifies for the Section 4(a)(1) exemption, then the shareholder making that offering can do so without registering the offering with the Commission (i.e., the shareholder has "free-trading shares").

35. Horn's May 10, 2017 opinion letters stated that, "[b]ased on a review of all PYTG filings on the OTC Markets website . . . PYTG has never reported as a shell company in its past filings." While the letters acknowledged that Rule 144 is unavailable to shell companies, the letters ultimately concluded that the Converted Shares "meet the criteria under Rule 144, and that all of the shares listed above may be issued as unrestricted, free trading stock."

36. On May 11, 2017, Horn sent the opinion letters to PYTG's transfer agent, and the transfer agent thereby issued free-trading shares of PYTG to Herman and Island Capital.

37. Herman paid Horn $1,000 for the opinion letters.

38. On May 22, 2017, Herman deposited his 371,000 shares of PYTG into a trust account in his name at Huntington National Bank (the "Huntington Account")

39. In or around May 2017, Baker opened a brokerage account in the name of Island Capital at a Richmond, Kentucky branch of Investment Professionals Inc. (the "IPI Brokerage Account"). Baker was the signor on the IPI Brokerage Account and had trading authority.

40. Baker also gave Herman trading authority over the IPI Brokerage Account.

41. On May 22, 2017, Island Capital deposited its 374,000 shares of PYTG into its IPI account.

42. Although both Baker and Herman had trading authority over the IPI Brokerage account, upon information and belief, it was Baker who placed all trades of PYTG out of the IPI Brokerage Account.

43. After selling 45,982 of its Converted Shares between May 23, 2017 and June 6, 2017, Island Capital transferred its remaining 328,018 Converted Shares to Herman's Huntington Account on July 20, 2017.

**Defendants' Manipulative Trading of PYTG**

44. After successfully receiving unrestricted shares of PYTG, Herman, with the assistance of Baker, began a campaign to liquidate his shares and Island Capital's shares.

45. To increase the share price at which he could sell off the Converted Shares, Herman engaged in manipulative trading activities in PYTG.

46. Specifically, beginning in April 2017, before Herman and Island Capital began selling off their Converted Shares of PYTG, Herman began purchasing shares of PYTG—which had no trading volume for several months prior—in open market transactions through multiple brokerage accounts that he opened in his name, in the name of Island Capital, and in the name of another entity he controls, Intrepid Capital Holdings Corp. (the "Herman Accounts").

47. Throughout April and May 2017, Herman engaged in heavy trading in PYTG through the Herman Accounts, both buying and selling PYTG numerous times a day to create the appearance of market activity.

48. Herman continued engaging in heavy trading in PYTG through the Herman Accounts throughout May 2017, when Herman and Island Capital (acting through Baker), began selling off the Converted Shares at the inflated prices.

49. The activity in the Herman Accounts on May 25, 2017 illustrates Herman's trading pattern during this timeframe.

50. On May 25, 2017, two of the Herman Accounts engaged in heavy trading in PYTG. Those accounts placed market-order buys, mostly in increments of 200 or fewer shares,

8

to periodically prop up the share price of PYTG so that Island Capital could periodically sell its Converted Shares of PYTG at the propped up, manipulated prices.

51. Over the course of the day, the Herman Accounts entered 54 total trades (13 sells and 41 buys), resulting in a loss of $5,734.70.

52. On the same day, Island Capital entered eight limit-order sales of the Converted Shares, resulting in profits of $44,891.16.

53. Herman's trading on that day created the appearance of activity in the market for PYTG and had the effect of increasing the share price from $6.76 at market opening to $7.30 at close.

54. On that day, the Herman Accounts accounted for 49% of the total trading volume in PYTG.

55. The Herman Accounts' trading between May 22, 2017 and May 30, 2017 further demonstrates Herman's manipulative trading.

56. During that timeframe, the Herman Accounts accounted for between 49% and 74% of the daily trading volume, and PYTG's share price progressively increased from an opening price of $5.40 on May 22, 2017, to a closing price of $8.37 on May 30, 2017.

57. Herman's manipulative trading had a clear impact on the market for PYTG. For several months prior to April 2017, PYTG had zero trading volume.

58. From April 10, 2017, when Herman began purchasing shares of PYTG, until August 24, 2017, when Herman liquidated the last of the Converted Shares, PYTG's trading volume averaged 24,407 per day, peaking at 169,354 shares on August 11, 2017.

9

59. Similarly, PYTG's share price went from $0.60 on April 10, 2017 to a high of $8.83 on June 1, 2017, at which point Herman began focusing his efforts on selling off the Converted Shares.

**Defendants' Fraudulent Sale of PYTG Shares through Boiler Rooms**

60. Concurrently with his efforts to manipulate the share price of PYTG, Herman hired boiler rooms to assist him in selling the Converted Shares.

61. Specifically, from May to August 2017, Herman paid operators of multiple boiler rooms to assist him in selling his PYTG shares by promoting the stock to innocent investors.

62. The trading initially involved only Herman and the boiler rooms and operated through a "matched-trading" scheme, as follows:

63. Herman paid the boiler rooms to initiate a cold calling campaign to promote and sell PYTG. Sales agents, equipped with lead lists and scripts, cold-called prospective investors and pitched them on an investment in PYTG. If an investor decided to purchase PYTG shares, the boiler room coordinated with Herman to determine a price and amount of shares for the trade. The sales agents then instructed the investor to place a buy limit order of PYTG at the coordinated price and amount of shares. Simultaneously, Herman placed a sell limit order at the same price and amount of shares, thus making it likely the buy and sell orders would "match" and that Herman could sell his shares to the solicited investor.

64. Herman and the boiler rooms operated in this manner for most of May 2017. However, Herman's sales did not always match with the solicited investors' buys. Instead, institutional investors with more sophisticated trading operations would sometimes capture the solicited investors' buy orders before Herman could. During this time, therefore, Herman only had marginal success offloading the Converted Shares through his matched trading scheme.

10

65. Beginning in June 2017, Herman began working with a trader, S.L., at the market-making firm Ascendiant Capital Markets LLC ("Ascendiant").

66. The boiler rooms continued to engage in their cold calling campaign, convincing investors to purchase PYTG shares.

67. But now, Ascendiant, through S.L., captured the trades by entering short sales throughout the day at market prices. At the end of the day, Ascendiant covered its short sales by purchasing shares from Herman.

68. In total, Herman sold nearly 500,000 shares of PYTG to Ascendiant.

69. Through this scheme, Herman succeeded in selling the majority of the Converted Shares and profited at least $810,830.78, while Island Capital profited at least $353,855.37. Baker, meanwhile, spent approximately $106,040.21 of Island Capital's proceeds on personal expenses.

70. By the end of August, 2017, when Herman, Baker, and Island Capital completed their scheme, the price of PYTG had plummeted to $0.22 a share, resulting in significant loss to investors who had purchased PYTG for up to $8.83 a share.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)]**
(*as to Herman, Baker, and Island Capital*)

71. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–70, inclusive, as if they were fully set forth herein.

72. By engaging in the conduct described above, Defendants Herman, Baker, and Island Capital, directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails has (a) employed devices, schemes, or artifices to

11

defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit.

73. With respect to violations of Section 17(a)(3) of the Securities Act, Defendants Herman, Baker, and Island Capital were at least negligent in their conduct.

74. With respect to violations of Section 17(a)(1) of the Securities Act, Defendants Herman, Baker, and Island Capital engaged in the above-referenced conduct knowingly or with severe recklessness.

75. By reason of the foregoing, Defendants Herman, Baker, and Island Capital violated and, unless enjoined, will continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## SECOND CLAIM FOR RELIEF
### Violations of Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)]
(*as to Horn*)

76. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–70, inclusive, as if they were fully set forth herein.

77. By engaging in the conduct described above, Defendant Horn, directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails has (1) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (2) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit.

78. In so doing, Defendant Horn was at least negligent in his conduct.

79. By reason of the foregoing, Defendant Horn violated and, unless enjoined, will continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

### THIRD CLAIM FOR RELIEF
### Violations of Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)]
### (*as to Herman and Island Capital*)

80. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–70, inclusive, as if they were fully set forth herein.

81. By engaging in the conduct described above, Defendants Herman and Island Capital, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, or any facility of any national securities exchange, or for any member of a national securities exchange, effected, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange, any security not so registered, or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

82. Defendants Herman and Island Capital engaged in the above-referenced conduct with specific intent.

83. By reason of the foregoing, Defendants Herman and Island Capital violated and, unless enjoined, will continue to violate Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

## FOURTH CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)]**
(*as to Herman, Baker, and Island Capital*)

84. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–70, inclusive, as if they were fully set forth herein.

85. By engaging in the conduct described above, Defendants Herman, Baker, and Island Capital, directly or indirectly, individually or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails has (a) employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, and course of business which operated as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

86. Defendants Herman, Baker, and Island Capital engaged in the above-referenced conduct knowingly or with severe recklessness.

87. By reason of the foregoing, Defendants Herman, Baker, and Island Capital violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants Herman, Baker, and Island Capital from, directly or indirectly, engaging in conduct in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5];

**II.**

Permanently restraining and enjoining Defendant Horn from, directly or indirectly, engaging in conduct in violation of Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)];

**III.**

Permanently restraining and enjoining Defendants Herman and Island Capital from, directly or indirectly, engaging in conduct in violation of Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)];

**IV.**

Permanently restraining and enjoining Defendant Herman from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account;

**V.**

Barring Defendants Herman, Baker, and Island Capital from participating in an offering of penny stock;

**VI.**

Ordering Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**VII.**

Ordering Defendants to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## VIII.

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and,

## IX.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated:  April 7, 2022.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**


 /s/ *Casey R. Fronk*
Casey R. Fronk
Tracy S. Combs
Attorneys for Plaintiff
Securities and Exchange Commission